Estate of Alice B. Davis, Robert L. Davis, Executor v. Commissioner.
Estate of Davis v. Commissioner
Docket No. 106645.
United States Tax Court
1943 Tax Ct. Memo LEXIS 493; 1 T.C.M. (CCH) 476; T.C.M. (RIA) 43040; January 25, 1943
*493 Arthur L. Evely, Esq., 1000 Penobscot Bldg., Detroit, Mich., and Raymond H. Berry, Esq., 1000 Penobscot Bldg., Detroit, Mich., for the petitioner. Philip M. Clark, Esq., and Paul A. Sebastian, Esq., for the respondent. MELLOTT
Memorandum Findings of Fact and Opinion MELLOTT, Judge: Respondent determined a deficiency in estate tax in the amount of $50,500.38. Several assignments of error have been abandoned, conceded or confessed. Their disposition is reflected in the following schedule. Amount
Issue
Description
Claimed
Disposition
4 (c) and
4 (d)
Property previously taxed
$19,322.26
Allowed $19,318.26
(Stipulation)
4 (e)
Property previously taxed
29,416.41
Allowed $29,416.41
(Stipulation)
4 (f)
Deduction for add. atty. fees
2,500.00
Allowed $2,500.00
(Conceded by respondent)
4 (g)
Deduction for add. adm. expense
500.00
Abandoned by petitioner.
The sole issue to be determined is whether respondent erred in holding that transfers made by decedent to her son and in trust for her grandson constituted gifts in contemplation of death and were therefore to be included in her gross estate under section 302 (c) of the Revenue Act of 1926 as amended. *494 Findings of Fact Alice B. Davis (hereinafter referred to as decedent) died testate March 30, 1939, at the age of 85 years, 5 months and 27 days. At the time of her death and for many years prior she was a resident of Grand Rapids, Kent County, Michigan. Her husband predeceased her. At the time of her death she was survived by a son, Robert L. Davis and by a grandson 16 or 17 years of age (Henry B. Davis, Jr.), who was the son of Henry B. Davis, the deceased twin brother of Robert L. Davis (sometimes hereinafter referred to as petitioner) is the duly qualified and acting executor of decedent's estate. Decedent's will was executed September 25, 1930. By paragraphs 2 and 3 she gave to her son, Robert L., her home in Grand Rapids and a cottage at Silver Lake. By paragraphs 4 to 7, inclusive, she gave property totaling $40,000 to other named relatives. By paragraph 8 "all the rest and remainder" of her property was divided into two equal shares, one of which was given to her son Robert L. The other half was "to constitute a distinct trust fund for the benefit of" her grandson Henry B., Jr., "to be paid to him when he reaches the age of thirty years, if he shows himself possessed of *495 good character and habits (does not smoke or drink or swear) and has sufficient business ability to care for what is given him." The income was to be paid to him annually in any event and at his death, or if he should not live to the age of 30 and unless he had blood issue to inherit in his stead, then his share was to be given to the American Board of Commissioners of Foreign Missions, the income to be used in its work in Shansi, China, and in Angola, West Africa. Decedent's brother Henry F. Barnard and her son Robert L. were appointed "executors and Trustees" and they were given broad powers in carrying out the terms of the trust. In the event the beneficiary should attain "full age and develop business capacity and prudence," the Probate Court for Kent County was authorized and directed to appoint him as one of the Trustees, "either in association with the other Trustees * * * or in substitution for any Trustee in whose office a vacancy may for any reason exist." Prior to December 16, 1936, decedent was the owner of property, real or personal, located in Wayne County. Michigan, having a value of approximately $303,000. She also owned property located in Grand Rapids, Michigan, *496 in the County of Kent having a value at the date of her death of approximately $325,000. The last mentioned property passed by her will, is being administered by her executor and is not in issue in this proceeding. On December 16, 1936, decedent executed a declaration of trust, under the terms and provisions of which she transferred all of her Wayne County property to her son, Robert L. Davis. One-half of the property was to be his "absolutely" and one-half was to be held by him as trustee, for the benefit of decedent's grandson, Henry B. Davis, Jr. The declaration of trust provided that the trust for the benefit of Henry B., Jr., should terminate when he attained the age of 30 years, at which time the corpus was to be turned over to him. It was further provided that if he died prior to the termination of the trust the property held for his benefit should be turned over to his children. In the event that there were no surviving children, then one-half of the property was to be turned over to Robert L. Davis and the other one-half to the Board of Foreign Missions of the Congressional Church to be used for the Shansi Mission in North China and the Angola Mission in West Central Africa. *497 The trust was irrevocable, the settlor retained no right to alter, amend or revoke it in any manner, and no beneficial interest in the property transferred was retained by her. The property transferred to Robert L. Davis consisted of real estate, mortgages, land contracts and bonds, and included all of decedent's property, both real and personal, located in Wayne County, Michigan. The trustee was to make equal division of the property as soon as possible after the acceptance of the trust and did so. The market value of the properties retained by him for the benefit of Henry B. Davis, Jr., was, at the date of decedent's death $149,789. The market value of the properties retained by him in his individual capacity was, at the date of decedent's death, $153,227. The total value of the properties transferred by decedent to her son, individually and as trustee, was $303,016 at the date of her death. Decedent's brother, Henry F. Barnard, a lawyer who maintained offices in Detroit, Michigan, had managed and controlled her Wayne County property from the year 1900 until his death in January 1934. From October 16, 1926, he acted under a power of attorney given to him by decedent, which authorized *498 him to purchase, hold, manage and control her real and personal property located in Wayne County, Michigan. From about 1930 he was assisted in this work by his son, Harry E. Barnard. After the death of Henry F. Barnard his son, Harry E. Barnard, also a lawyer, assumed the management and control of decedent's Wayne County property, which he exercised up to the time of the execution of the deed of trust on December 16, 1935. Prior to the year 1900 decedent's Wayne County property had been managed and controlled for a number of years by John Ward, an attorney with offices in Detroit, Michigan. Decedent did not personally exercise any management or control over her Wayne County property. The income from decedent's Wayne County property was permitted to accumulate and was reinvested and held with the principal. No part of the principal or income was turned over to decedent except $6,000 which was transferred to her in December 1926. The only gifts made by decedent from her Wayne County property prior to the execution of the trust were as follows: June 16, 1922 - Henry B. Davis, dece-
dent's son
$100,000
January 3, 1928 - Springfield Vermont
Library
1,000
April 28, 1928 - Yale University
100,000
March 31, 1930 - Robert L. Davis, dece-
dent's son
100,000
*499 None of these gifts was made by decedent from property located outside of Wayne County, Michigan. For many years the decedent lived in Grand Rapids, Michigan, with her sister, Mary E. Barnard, who died December 25, 1936. Mary E. Barnard also owned property located in Wayne County, Michigan, which was managed and controlled by her brother, Henry F. Barnard, and hnr nephew, Harry E. Barnard. Prior to its control by Henry F. Barnard this property was managed and controlled by John Ward. It was ultimately conveyed by Mary E. Barnard by a trust agreement executed by her. Decedent and her sister were very intimate and frequently consulted together with regard to their business affairs and the disposition of their properties. The two sisters were some-what alike but had different interests and activities. Decedent was a very active person while her sister Mary was of a retiring disposition and decidedly inactive. Decedent was interested in missions and church work and gave quite lavishly to their support. Mary was not interested in missions and did not contribute to them. Both made substantial gifts from their Wayne County properties to charitable and educational institutions and to members *500 of their respective families. Both made donations to Yale University and among other things contributed to SpringfieldVermont Library and rebuilt an old grade school located on the family farm, which was of particular interest to them. Mary E. Barnard, to whom reference has been made, is the same person whose estate was the petitioner in a proceeding before the Board of Tax Appeals in Docket No. 98938. In 1929 or 1930 the decedent consulted with her attorney, Ganson Taggart, concerning a trust instrument relating to her Wayne County property which she wanted him to redraft. Taggart made a redraft of the agreement according to her suggestions and turned both drafts over to her. They were not found among her papers after her death. Taggart prepared the will executed by decedent in December 1930. He also prepared the instrument here in question transferring the Wayne County property to Robert L. Davis, which was signed by the decedent on December 16th, 1935. Sometime after the death of decedent's son, Henry, which occurred in 1925, decedent talked with her nephew, Harry E. Barnard, about her plans to dispose of her property in Wayne County. During these conversations she mentioned *501 that she intended to see that her grandson, Henry B. Davis, Jr., who was an infant at that time, was provided for, and also that she intended to give something to her son, Robert. In these conversations she referred to her interest in the church and missionary activities. Among the papers left by decedent was a document in her handwriting dated 1894 and unsigned. It provided for the transfer and conveyance of certain property then being managed by John Ward to decedent's sister, Mary E. Barnard, and to her brother, Henry F. Barnard, as trustees, in the event that she should die prior to the expiration of the agreement with Ward. The instrument provided that it was to remain under her control and subject to revocation or modification by her, in whole or in part, during her lifetime and, in so far as not revoked or modified, that it was to become in full force and operative at her death. It also provided that it should not be affected by any will which she might make. According to its provisions $10,000 was to be paid to the town of Springfield, Vermont, and $25,000 was to be held by the trustees for the benefit of the Women's Board of Missions of the Interior. The balance of the property *502 and accumulated income was to be held by the trustees for the benefit of the author's (decedent's) children for a period of 25 years and at the end of that time was to be divided equally between her children then living. If any child had died leaving children, they were to receive the deceased parent's share. Another paper in decedent's handwriting, dated April 20, 1894, and signed by her, was found among her effects. It purported to designate certain persons as agents for the expending of $25,000 being left in the hands of Henry F. Barnard and Mary E. Barnard, as trustees. Decedent managed and controlled the properties in Grand Rapids herself and, in general, without any direct help or assistance. On some occasions she consulted her attorney upon legal matters and problems involving income taxes. Up to the time of her death she kept a book of accounts for income tax purposes. The entries in this book were made by her and were substantially correct and accurate. She frequently visited the offices of her attorney and physician but on no occasion did she require any physical assistance. On the Sunday preceding her death she attended church in the morning and had dinner at a hotel in *503 Grand Rapids. Decedent was a very active woman and had a number of special interests. She enjoyed reasonably good health for a woman of her age. In 1937 she made a trip to Springfield, Vermont, and other points in the east. On that occasion she traveled alone. Her physician consented to her going because she then seemed in good general health. She was proud of the longevity of her family, some of the members of which had lived to ages ranging from 80 to 90 years. During the last few years of her life she lived alone except for a maid who took care of the household duties and prepared the meals. She lived in a large house with extensive grounds. She was active about the house and interested in her flower and vegetable gardens, in which she spent considerable time. The cause of decedent's death was coronary thrombosis and death occurred suddenly during the night. Her physician had called to see her two weeks prior to her death and at that time diagnosed her ailment as coronary thrombosis. He did not, however, advise her of that fact. He recommended that she go to bed and have a nurse in attendance. She refused to have a nurse because she didn't think her trouble amounted to anything. *504 She was living alone at the time except for a maid who did the housework. Decedent had the same physician for seven or eight years prior to her death. During this time he saw her occasionally either in his office or at her home, the latter occasions being mainly when he called to see her sister. In the latter part of 1935 and the early part of 1936, about the time the transfers here in issue were made, decedent's general health was good, she was active and spry, took care of all her own business and did not complain of her health or show any indication that she felt death was near. She had a marked chronic constipation due to a weak abdominal wall or ventral hernia, dating back to the birth of her children. Her physician advised her to wear a special type of corset for this, but she refused to do so until shortly before her death. She had a high blood pressure, in the neighborhood of 180, but did not appear to suffer any inconvenience on account of it and never complained about it. She had no acute attack of coronary thrombosis prior to two weeks before her death and her physician had not made any diagnosis including that disease prior to that time. She did not appear to be apprehensive *505 about her physical condition, and did not express any concern over her health. She appeared to be proud of the fact that she was active and able to take care of her affairs. Her pulse rate was between 60 and 80, was of good quality and usually very regular. Her heart was moderately enlarged to compensate for her blood pressure and as a natural consequence of it. The transfers made by decedent in December, 1935, to her son, Robert, individual and as trustee for her grandson, Henry B. Davis, Jr., were made in contemplation of death. Opinion The finding which has been made is dispositive of the sole issue to be decided. The question is one of fact, First National Bank of Boston v. Commissioner, 63 Fed. (2d) 685; Flack v. Holtegel, 93 Fed. (2d) 512, to be determined from all the pertinent facts and circumstances surrounding the transfers. The applicable statute is section 302 (c) of the Revenue Act of 1926 as amended, which is shown in the margin.[1] (Cf. Sec. 811 (c), Internal Revenue Code.) *506 "Contemplation o,f death" as used in the statute, requires that the triers of fact apply a subjective test and attempt to ascertain from the available facts "the state of mind" of a donor whose lips have been sealed by death. United States v. Wells, 283 U.S. 102. Decided cases, at best, are of comparatively slight aid; for the facts are as varied as the personalities of the donors. Collectively they suggest that all proper evidence, even circumstantial, should be considered, Farmers' Loan & Trust Co. v. Bowers, 68 Fed. (2d) 916, certiorari denied, 293 U.S. 565; and "hardly any fact is too minute for consideration." Paul, Federal Estate and Gift Taxation, p. 244 and note. "The differentiating factor must be found in the transferor's motive. * * * the motive which induces the transfer must be of the sort which leads to testamentary disposition." "There can be no precise delimitation of the transfer embraced within the conception of transfer in 'contemplation of death' as there can be none in relation to fraud, undue influence * * * or other familiar legal concepts * * *." United States v. Wells, supra. *507 What was decedent's motive in making the transfer of approximately half of her property to her son and grandson when she was past 82 years of age - dividing it per stripes between her son and the son of his deceased twin brother? Petitioner argues that it was to effectuate and consummate a plan made by her "many years before of disposing of the specific portion of her property located in Wayne County, Michigan, for the benefit of certain institutions and members of her family" and that she was motivated by an "interest in these institutions [missionary and church activities] and her desire to provide a fund for the benefit of her children and grandchildren." Respondent insists and determined the deficiency upon the theory that there was an "absence of any definite motive * * * except that which prompts owners to dispose of their property to the natural objects of their bounty, thereby accomplishing dispositions testamentary in character." Respondent's view seems to be justified by the evidence, which will now be reviewed briefly. The pertinent facts are not seriously in dispute. In 1935, by a gift to her son and a trust in favor of her grandson, the decedent transferred *508 property having a value of approximately $303,000 or 45 percent of her gross estate. The trust was irrevocable. At the time of the transfer decedent was 82 years old. She was mentally alert and physically active for her age. She managed and controlled her property located in Grand Rapids, Michigan, where she lived, which comprised something over one-half of her estate and had a value of approximately $335,000. She kept a book of accounts which was substantially accurate. She lived alone in a large house except for a maid and spent considerable time in her gardens. Her health seemed reasonably good for a woman of her age and she moved around freely without assistance. She had abnormally high blood pressure and suffered from chronic constipation aggregated by a weak abdominal wall, or ventral hernia, of many years standing, but did not appear to be unduly concerned about it. She consulted her physician occasionally. She took pride in the longevity of her family and often referred to it. The immediate cause of her death in 1939 was coronary thrombosis which first came to the attention of her physician about two weeks before she died. Decedent was interested in her church and in missionary *509 work and contributed generously to their support. She was also interested in Springfield, Vermont, the home of her youth, and in Yale University, to which she made substantial gifts. But her primary interest was in her immediate family. In 1922 she gave her son Henry (who died in 1923) $100,000, and on March 31, 1930, six months before she executed her last will and testament, she gave Robert $100,000. These were the only substantial gifts, disclosed by the record, made to her sons prior to the transfers here in question. [2]
Examining more carefully petitioner's contention that the gifts were made in consummation of a plan adopted many years previously of aiding "certain institutions" (church and missionary activities, library, school, etc., in the home of her girlhood) we find very little in the present record to support the theory that the Wayne County property was held intact for approximately a half century to effectuate this purpose, except *510 the gift of $100,000 to Yale University in April, 1928, and the gift of $1,000 to the library in January of the same year. Petitioner attempted to connect, by inference, decedent's interest in missionary and church activities with the Wayne County property. In this, we think, he failed. The unsigned trust instrument written in 1894 and found among decedent's papers after her death provided, after minor gifts, that the balance of the Wayne County property should be held in trust for her children and the corpus and any accumulations should be divided equally between them at the end of twenty-five years. The trust, however, was not to become effective during the decedent's lifetime but was to take effect at or after her death. In her last will and testament executed in 1930 decedent disposed of all her estate, including the Wayne County property. Shortly before executing it she had equalized the gifts made to her two sons by giving Robert $100,000. (Cf. McClure v. Commissioner, 56 Fed. (2d) 548, certiorari denied, 287 U.S. 609.) The will, after providing for relatively small personal bequests, directed that all the rest and *511 remainder of the property should be divided into two equal shares - one-half to be given to her son Robert and the other half to be placed in trust for the benefit of her grandson Henry B., Jr., to be paid to him when he reached the age of thirty years. The "Declaration of Trust," executed by her in 1935, made substantially the same disposition of the Wayne County property. One-half of it was given to her son Robert and the other half was placed in trust for the benefit of her grandson Henry B., Jr., to be paid over to him with any accumulated income when he became twenty-one years of age. When we consider together the holographic trust instrument written in 1894, the decedent's last will and testament executed in 1930 and the "Declaration of Trust" executed in 1935, the plan of the decedent for the ultimate disposition of her Wayne County property emerges. For more than forty years she had allowed that property to accumulate, under competent management. In 1935, when it was obvious that she would never need the property for her own requirements, she transferred it to the same persons in the same proportions and under substantially the same terms as set out in her last will and testament. *512 These facts indicate, not a long continuing intention to dispose of the Wayne County property during her lifetime, but rather a long continuing intention to dispose of it at or near the time of her lifetime, but rather a long continuing intention to dispose of it at or near the time of her death, to the "objects of her natural bounty." It is reasonable to assume that decedent, being a practical woman, took into consideration the fact that she was 82 years old, that the sands of life were fast running out, that her life expectancy was short, and that her fortune would be more than sufficient for her needs without the Wayne County property. It would be closing our eyes to the obvious to say that thought of these matters did not enter into decedent's mind and motivate the transfer. Age alone does not furnish a decisive test as to whether a transfer is motivated by considerations associated with death, Flack v. Holtegel, supra; but where, as here, other facts strongly point to testamentary disposition, old age may tip the scales. Petitioner has not sustained his burden of showing that the gifts were motivated by impulses primarily associated with life. *513 United States v. Wells, supra;Oliver, et al., Executors, v. Bell, 103 Fed. (2d) 760. The doness were not shown to be in want or dependent upon the decedent. Decedent was not burdened with the management of the property transferred. There was no apparent necessity or desire to protect the property from business hazards, and, as pointed out above, no previously adopted policy with respect to making gifts to decedent's immediate family has been shown. On the other hand the record points unquestionably to motives of the sort which lead to testamentary disposition. United States v. Wells, supra; cf. Estate of Millie Langley Wright, 43 B.T.A. 551: Updike v. Commissioner, 88 Fed. (2d) 807. The property transferred constituted approximately one-half of the estate which decedent had disposed of by will. Its transfer to the same persons and under the same conditions did not change the testamentary character of the disposition but merely advanced the time of enjoyment. The net result was a disposition of the whole estate according to a comprehensive *514 plan of many years standing as evidenced by her last will and testament. Cf. Updike v. Commissioner, supra. Upon brief the parties discuss at some length, an unpublished memorandum opinion of the Board of Tax Appeals entered in a proceeding brought by the Estate of Mary E. Barnard. The record in that proceeding was not offered in evidence and whether it, or any part of it, would constitute competent or relevant evidence upon the present issue need not be decided. We have found from the evidence before us that the sisters had different interests and activities, that one was active and spry and the other decidedly inactive, that one was interested in missions and the other was not, that both made substantial gifts to charitable and educational institutions and to members of their families and that they frequently consulted together with reference to their business affairs and the disposition of their properties. It might be added that Mary was an elderly spinster while this decedent was the mother and grandmother of the recipients of her bounty. Other alleged distinguishing characteristics are set out in respondent's brief; but since they may be gleaned *515 only from a detailed examination of the record in the other proceeding we mention one of them. The present record in our judgment supports respondent's determination that the gifts made by this decedent were in contemplation of death, as such term is defined by the Supreme Court in United States v. Wells, supra. We therefore respectfully decline to disturb it. Cf. Bradley v. Smith, 114 Fed. (2d) 161; Oliver, et al. v. Bell, supra;Updike v. Commissioner, supra;Purvin v. Commissioner, 96 Fed. (2d) 929, certiorari denied, 305 U.S. 626; Smails v. O'Malley, 127 Fed. (2d)410. Decision will be entered under Rule 50. Footnotes
1. Revenue Act of 1926: Sec. 302 (as amended by section 404 of the Revenue Act of 1934). The value of the gross estate of the decedent shall be determined by including the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated, except real property situated outside the United States - * * * (c) (as amended by Joint Resolution of March 3, 1931, Public, No. 131, Seventy-first Congress, and by section 803 (a) of the Revenue Act of 1932). To the extent of any interest therein of which the decedent has at any time made a transfer, by trust or otherwise, in contemplation of or intended to take effect in possession or enjoyment at or after his death, * * *↩
2. (Compare the facts in the Wells case, supra, ↩ where decedent had consistently followed the practice of making substantial gifts to his children for nearly thirty years, several of which are set out in the court's opinion.)